UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**TERRENCE J. QUIGLEY and T.J.Q. ENTERPRISES, INC.,**

                         **Plaintiffs,**

            **-vs-**                                  **5:03-CV-1198**
                                                             **(NAM/DEP)**

**THE CITY OF SYRACUSE, MATTHEW J. DRISCOLL,
individually and as the Mayor of Syracuse, CHARLES J.
EVERETT JR., individually and as the Director of Operations
of the city of Syracuse, and ANTHONY J. MANCUSO,
individually and as the Commissioner of Aviation of the
City of Syracuse, New York,**

                         **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES** | **OF COUNSEL** |
| SUGARMAN LAW FIRM, L.L.P. | George E. DeMore, Esq. |
| *Attorneys for Plaintiff* | |
| 360 Warren Street | |
| HSBC Center, Fifth Floor | |
| Syracuse, New York 13202 | |
| | |
| CORPORATION COUNSEL | Nancy J. Larson, Esq. |
| for the CITY OF SYRACUSE | Assistant Corporation Counsel |
| 300 City Hall | |
| Syracuse, New York  13202 | |
| | |
| PETRONE, PETRONE LAW FIRM | David H. Walsh, IV, Esq. |
| 1624 Genesee Street | |
| Utica, New York 13502 | |

**NORMAN A. MORDUE, Chief U.S. District Judge**

### MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

       Presently before the Court is defendants' motion for summary judgment pursuant to Fed.

R. Civ. P. 56.  Plaintiff, Terrence J. Quigley, alleges that his civil rights under the First and

Fourteenth Amendments were violated when the individually named defendants terminated and/or opted not to renew a vendor contract between the defendant City of Syracuse and plaintiff's company, TJQ Enterprises, Inc., d/b/a AMCOR.  Plaintiff's constitutional claims are premised upon 42 U.S.C. §§ 1983 and 1985.  Plaintiff also asserts state law claims for breach of contract and tortious interference with contract.

## II.   FACTUAL BACKGROUND

In short, plaintiff TJQ Enterprises, Inc. and the City of Syracuse entered into a contract for baggage delivery services at Syracuse's Hancock International Airport on October 16, 2001.  Prior to that date, plaintiff had been operating a baggage delivery service at the airport via a license issued by the City of Syracuse.  The new contract was designed to increase airport revenue by requiring vendors to pay to the City a percentage of revenues in lieu of a mere licensing fee.  The contract as executed by the parties was slated to expire on August 31, 2002.  Pursuant to the express terms of the contract, either party could terminate it upon thirty (30) days written notice. In August 2002, the parties agreed to continue the existing contract on a month-to-month basis.  In November 2002, the defendant Mayor Matthew Driscoll, replaced defendant Charles Everett with defendant Anthony Mancuso as Commissioner of Aviation.  Defendant Driscoll then appointed defendant Everett as Director of Operations for the defendant City.  Beginning in February 2002 and continuing until November 2002, plaintiffs were late on or failed to make concession payments to the City of Syracuse as required by the contract.

On July 10, 2003, defendant Mancuso, as Commissioner of Aviation, advised plaintiffs that the City of Syracuse would be terminating the contract for baggage services with TJQ Enterprises, Inc. as of August 10, 2003.  Plaintiffs continued to operate their baggage delivery service after August 10, 2003, by picking up bags off of airport property.  On August 11, 2003, plaintiff

2

Quigley was ticketed by the City of Syracuse police department for engaging in revenue-producing activity at the airport without a license or contract.  On August 12, 2003, defendant Mancuso advised at least one airline service with whom plaintiffs did business that plaintiffs were operating an "illegal baggage delivery service" at the airport as of midnight on August 10, 2003, and that the airline was thereby in violation of airport regulations by continuing to do business with TJQ Enterprises, Inc.

On August 21, 2003, plaintiff Quigley requested that the City renew its contract with TJQ Enterprises, Inc.  By letter dated October 20, 2003, defendant Mancuso denied plaintiff's request to renew the contract after stating he had considered the "current baggage delivery service needs" at the airport, plaintiffs' "failure to make timely payments of amounts due the Department of Aviation under [the] previous agreement for baggage delivery service," and plaintiffs' failure to cease operations at the airport as directed upon expiration of the prior contract.  Upon non-renewal of plaintiffs' contract, LGT International, Inc., a corporation owned by Samir Tawil, was the exclusive authorized baggage delivery service at the airport.  Plaintiffs' complaint asserts that Tawil had no prior experience in operating a baggage delivery service for airlines prior to being awarded the City of Syracuse airport contract.[1]

Plaintiff Quigley, whose council states he is a registered Republican, contends that defendants conspired illegally to terminate his contract solely to reward Tawil, an alleged Democrat and political supporter of defendant Mayor Matthew Driscoll.  Plaintiff Quigley claims

---

[1]

The Court notes that the record is silent on the issue of what experience, if any, plaintiff Quigley had insofar as operating an airport baggage delivery service prior to obtaining a license to operate such a business at Hancock International Airport.  A newspaper article attached to plaintiffs' opposing papers merely described plaintiff Quigley as a "retired high school teacher."

he was targeted by defendants because he was a "frequent and outspoken" critic of defendants concerning the manner in which they administered operation of the airport.  According to plaintiffs, defendants also interfered with their business contracts and relationships with various airlines which were willing to continue doing business with TJQ Enterprises, Inc., but for the contract cancellation.

In support of his constitutional and state law claims,  plaintiff asserts that the defendant City officials did not follow proper or customary bidding procedures in awarding an exclusive contract to LGT International, Inc.  Plaintiffs also allege that defendants and the City of Syracuse violated the City's policy of not doing business with any vendor in arrears on city property taxes by awarding the baggage delivery contract to Tawil as political payback in spite of Tawil owing nearly $100,000.00 in back city property taxes.  In further support of his allegations that defendants gave the baggage delivery contract to Tawil as political patronage, plaintiff Quigley contends that defendants attempted to award the City's lucrative airport parking concession contract to Arthur "Skip" Henning, another political supporter of the Mayor, who had no prior operating experience, but were thwarted by publicity regarding the deal which appeared in the local newspaper.

Defendants deny plaintiffs' allegations regarding an alleged conspiracy to deprive him of a constitutionally protected property right and their alleged efforts to interfere with plaintiff Quigley's business contracts and relations.  Further, defendants assert that even assuming the truth of plaintiffs' allegations, they had no property or liberty interest in the contract at issue since either party could terminate the contract upon thirty (30) days notice.  Based thereupon, defendants argue plaintiffs ha ve failed to state any valid cause of action herein.

**III.**     **DISCUSSION**

4

A.     Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion.  *Western World Ins. Co. v. Stack Oil*, 922 F.2d 118, 121 (2d Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that nonmoving party must do more than merely show "some metaphysical doubt" as to material facts to escape summary judgment).  It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

B.     Plaintiffs' Claims Under 42 U.S.C. § 1983

1.     Deprivation of a Property or Liberty Interest

Plaintiffs' first four causes of action are premised on violations of federal and constitutional rights actionable under 42 U.S.C. § 1983 which provides a federal cause of action for "deprivations of any rights, privileges or immunities" secured by the Constitution and federal

5

laws.  To state a claim upon which relief may be granted under § 1983, a plaintiff must allege 1) that the challenged conduct was attributable to a person acting under color of state law; and 2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States.  *See Eagleston v. Guido*, 41 F.3d 865 (2d Cir. 1994).  The contested issue here is whether plaintiffs' complaint alleges properly the deprivation of a right, privilege or immunity guaranteed by federal law or the Constitution.

In determining whether a litigant has a cognizable claim for a violation of due process under the Fourteenth Amendment, courts must determine 1) whether the litigant was possessed of a liberty or property interest; and 2) what process, if any, was due prior to deprivation of that interest.  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 312 (2d Cir. 2002) (citing *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995)).

Based thereupon, the Court will determine in the first instance whether plaintiffs have a cognizable property or liberty interest upon which each of the first four causes of action is based.

Property interests are not created by the Constitution - they are defined by independent sources such as federal and state law.  *See Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972).  "To have a property interest ... a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it ..." *Id*.  When determining whether a plaintiff has a claim of entitlement, courts must focus on the applicable statute, contract or regulation that purports to establish the benefit. *See Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994).

In the present case, plaintiffs contend that in refusing to renew their airline baggage delivery contract with the City of Syracuse, defendants denied to them property interests without due process of law including: 1) their right to pursue their respective commercial interests and

6

avocations; and 2) their right to enter and have access to the Hancock International Airport.  There is no evidence that defendants ever denied plaintiff Quigley access to the airport in his individual or personal capacity.  The issue is merely that defendants prohibited him from having access to airport property to conduct business in the absence of a valid contract with the City.  Thus, both of plaintiffs' property deprivation claims turn on whether defendants' refusal to renew plaintiffs' baggage delivery contract was a constitutional violation.

Under New York law, a contract for services that makes no specific provision for duration is presumed to be terminable at will.  *See, e.g., Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 305 (1983) (employment contract); *Haines v. City of New York*, 41 N.Y.2d 769, 773 (1977) ("exclusive agency, distributorship, or requirements contracts which have been analogized to employment contracts").  Defendants argue correctly that an interest that state law permits to be terminated at the whim of another person is not a property right that is protected by the Due Process Clause.  *See, e.g., Bishop v. Wood*, 426 U.S. 341, 345-47 (1976) (no property interest due to absence of for-cause provision in contract); *Goetz v. Windsor Cent. Sch. Dist.*, 698 F.2d 606, 608-09 (2d Cir. 1983) (no property interest in plaintiff's employment as janitor under collective bargaining agreement, since nothing in agreement altered status as at-will employee).  The Court's inquiry would end here if plaintiffs claimed simply that their airport baggage contract with the City created a constitutional right to continued renewal of the contract since it is undisputed that the agreement was terminable at will, it could not - standing alone - create a viable constitutional property interest.

In the present case, however, plaintiffs claim that two additional impermissible factors played a role in the City's determination not to renew their contract.  Specifically, plaintiff Quigley asserts that he lost the airport baggage contract with the City because he was a registered

Republican and because of his criticism of defendants' administration and operation of the airport.

Thus, Quigley contends that the loss of a property interest was related to defendants' unlawful

denial to him of free speech and/or political affiliation guaranteed by the First Amendment.

Defendants contend nevertheless that since the agreement between the parties herein was

terminable at will, the Court is "prohibit[ed from inquiring] . . .  whether the termination was

activated by an ulterior motive, e.g., Plaintiff's political affiliation."  It is the defendants' position

that even assuming the truth of plaintiffs' allegations that political patronage was the motivating

factor behind non-renewal of his contract, First and Fourteenth Amendment protections cannot be

invoked by an independent service provider who lacks a contractual right to a continued

commercial relationship with the City of Syracuse.  For the reasons stated below, this Court

disagrees.

Generally, a public employee is protected from adverse employment decisions based upon

the employee's exercise of his First Amendment rights.  *See Rutan v. Republican Party*, 497 U.S.

62, 75-76 (1990); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Political patronage or party

affiliation are impermissible reasons for dismissing government employees absent a showing that

"party affiliation is an appropriate requirement for the effective performance of the public office

involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980); *see also Rutan*, 497 U.S. at 74-76; *Elrod v.

Burns*, 427 U.S. 347, 372-73 (1976).  The rule has been extended to promotion, transfer, recall,

and hiring decisions based on party affiliation, *see Rutan*, 497 U.S. at 79, the denial of

compensation, *see Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir. 1988), demotion, *see

McEvoy v. Spencer*, 124 F.3d 92, 103-05 (2d Cir. 1997), and, importantly for the sake of resolving

the present dispute, protection of independent contractors, *see Bd. of County Comm'rs, Wabaunsee

County, Kansas v. Umbehr*, 518 U.S. 668, 679 (1996)*; O'Hare Truck Serv., Inc. v. City of*

8

*Northlake*, 518 U.S. 712, 722 (1996).

Both *Elrod* and *Branti* make plain that a plaintiff's alleged lack of a contractual or statutory right to continued employment is immaterial to the invocation of First Amendment protections.  Neither case lends support to the proposition that due process concepts of state-created property interests are an appropriate measure of the First and Fourteenth Amendment principles enunciated in those cases.  *See Brady v. Paterson*, 515 F. Supp. 695, 696 (N.D.N.Y. 1981).  Thus, while there is no property interest or entitlement to be reappointed to a government position, failure to reappoint solely because of party affiliation is impermissible.  *See Branti,* 445 U.S. at 515.  Additionally, failure to renew a contract with an independent service provider based solely on political affiliation is equally impermissible.  *See O'Hare*, 518 U.S. at 720-21 (citing *Branti*, 445 U.S. at 516-17) (while government officials may terminate at-will relationships, unmodified by any legal constraints, without cause, it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views).  However, if the government terminates its affiliation with a service provider for reasons unrelated or in addition to political association, there will be no First Amendment violation.  *See Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977) (even if constitutionally protected conduct played "substantial part" in school board's decision not to rehire teacher, action did not necessarily amount to constitutional violation if board would have reached same decision in absence of protected conduct by teacher); *Visser v. Magnarelli*, 530 F. Supp. 1165, 1173 (N.D.N.Y. 1982) (council could always dismiss or fail to rehire plaintiff for legitimate apolitical reasons, even if reasons were "coupled with" the constitutionally flawed reason of plaintiff's political beliefs).

Having established that the absence of a "for cause" provision in plaintiffs' contract with the City is not fatal to their constitutional rights deprivation claims, the Court turns to the

applicable legal standard for evaluating these causes of action.  In assessing when political party affiliation may be an acceptable basis for terminating a public employee, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.  *See Branti*, 445 U.S. at 518.  A different, though related, inquiry is called for where a government employer takes adverse action on account of an employee or service provider's right of free speech.  To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination.  *Rutan*, 497 U.S. at 74-76; *see also Umbeher,* 518 U.S. at 685 ("To prevail, [plaintiff] must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the Board members before they terminated him").  If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.  See Mt. Healthy, 429 U.S. at 287.  And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong.  *See Pickering v. Bd. Of Educ. of Township High School, Dist. 205*, 391 U.S. 563, 568 (1968) (government employees' First Amendment rights depend on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.")

    *Umbehr*, *supra,* was the first case in which the Supreme Court addressed the issue of whether, and to what extent, the First Amendment limits the ability of a federal, state or local government to terminate contractual relationships with independent contractors because of the latter's exercise of their right to free speech.  The plaintiff in *Umbehr* sued under 42 U.S.C. § 1983

alleging that the defendant county had refused to renew his trash hauling contract because of his

vigorous criticism of the three-member county board.  518 U.S. at 670.  The Court held that the

defendant county could not restrict the plaintiff's right to free speech by terminating his contract,

although it was free to utilize the *Pickering* balancing test to terminate contractors for other

legitimate reasons.

In the present case, plaintiff's constitutional claims are dependent upon proof that political

patronage or punishment for engaging in political speech was a motivating factor in the City's

determination not to renew his contract.  Defendants have presented deposition transcripts of the

parties, of non-party witnesses and various documents exchanged during discovery in support of

their claim that there is no evidence the decision not to renew plaintiff's contract was political.

Far short of pointing to facts in the record or other evidence which dispute defendants'

assertion, plaintiffs argue merely that "it may be reasonably inferred" that politics and patronage

played a substantial or motivating factor in defendants' actions.  However, to defeat a summary

judgment motion that is properly supported by affidavits, depositions, and documents as

envisioned by Fed.R.Civ.P. 56(e), the opposing party is required to come forward with materials

envisioned by the Rule, setting forth "specific facts showing that there is a genuine issue of

material fact to be tried."  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  A party

cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements,

or on mere assertions that affidavits supporting the motion are not credible, *see, e.g., L & L Started

Pullets, Inc. v. Gourdine*, 762 F.2d 1, 3-4 (2d Cir. 1985); *Wyler v. United States*, 725 F.2d 156, 160

(2d Cir. 1983).  Conclusory allegations, conjecture, and speculation are insufficient to create a

genuine issue of fact.  *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("[T]he

non-moving party may not rely on mere conclusory allegations nor speculation, but instead must

offer some hard evidence showing that its version of the events is not wholly fanciful. "); *see, also Lisa's Party City v. Town of Henrietta,* 185 F.3d 12, 17 (2d Cir. 1999) (affirming grant of summary judgment where "appellant's assertion that the Town enforced the ordinance against it with an impermissible motivation [was] sheer 'conjecture and speculation'").

Insofar as evidence of political patronage, plaintiffs ask the Court to assume and infer - apparently from information in the public domain - that politics was the motivating factor in the present case.  Plaintiffs' counsel avers that plaintiff Quigley is a Republican and Samir Tawil is a Democrat, but there is no indication in his affidavit of the basis for this alleged knowledge. Indeed, there is no evidence in the record to establish the political affiliation of any party or witness in this case short of testimony by non-party witness Maureen Fogerty that defendant Charles Everett "is a Democrat."  The Court can reasonably take judicial notice that defendant Mayor Matthew Driscoll is a Democrat based on his public record of seeking election to both the Syracuse Common Council and the Mayor's office as a registered Democrat.  However, plaintiff has not set forth sufficient evidence for the Court to assume or infer the political affiliation of defendant Mancuso or the various non-party witnesses referred to in the record.

What the Court can glean from plaintiffs' submissions are the following facts:  Prior to 2001, plaintiff TJQ Enterprises, Inc. was conducting business for an undisclosed number of years at the Syracuse airport under a license issued by the City of Syracuse.  In 2001, plaintiffs entered into a one year contract for concession services at the airport.  Upon expiration of the contract in August 2002, the parties continued operating under the terms of the previous year's contract on a month-to-month basis in spite of the fact that from February 2002 to November 2002, plaintiffs were in arrears concerning payment of a percentage of gross receipts due to the City pursuant to the contract.

Sometime in the fall of 2001, Samir Tawil, a political supporter of and fundraiser for the Mayor, contacted his friend Charles Vinal, also a political supporter of and fundraiser for the Mayor, to inquire about the possibility of obtaining the airport baggage delivery contract with the City of Syracuse.  Mr. Vinal contacted defendant Everett to obtain information about securing such a contract and Mr. Everett told him that an application must be sent to the Commissioner of Aviation.  In November 2002, the Mayor replaced defendant Everett with defendant Mancuso as Commissioner of Aviation.  Thereafter, plaintiff Quigley attempted to discuss renewal of his contract with defendant Mancuso more than once and was "put off."  Defendant Mancuso told plaintiff Quigley he had no information for him concerning renewal of his contract.  At the same time, defendant Mancuso knew that Samir Tawil's company, LGT, had applied to conduct the airport baggage delivery service and that a public hearing was scheduled in December 2002, to consider LGT's request.

Plaintiff has alleged that the City did not comply with its own "rules and regulations" concerning bidding procedures in awarding the airport baggage contract to LGT which did not have all of the necessary permits, insurance and licensing prior to being awarded the contract. Indeed, the record demonstrates that there was a delay between the City's determination to award the contract to LGT and LGT obtaining required permits, licenses, etc.  However, there is no evidence that the City actually had an official or required bidding procedure for airport contracts. Plaintiffs rely on the testimony of administrative aide Theresa Smith who stated that while working at the Aviation Commissioner's office, she had never seen a situation where the Commissioner recommended approval of a baggage delivery vendor when required licenses and other paperwork was not yet in the file.  While this testimony suggests that having necessary licenses and paperwork in place prior to final approval of a vendor was the usual course, it does

13

not prove that the City had never before made a similar allowance to an independent contractor or that the allowance in this case was premised on LGT's owner's political affiliation. Moreover, there is no evidence that the City allowed LGT to begin operating at the airport until it had secured the appropriate required paperwork.

Plaintiffs also argue that the City disregarded its tax compliance policy by contracting with LGT which was in arrears on City property taxes. Again, however, notably absent from the record is proof that the City actually had an official or formal policy of not doing business with vendors who owed back taxes. Defendant Everett testified that he "would like" vendors seeking to contract with the City to clean up any outstanding tax liabilities prior to being awarded contracts. Defendant Everett also testified that the Mayor had stated the City "shouldn't do business with those who owe us money." These statements, while suggesting a preference on the part of defendants as to how to conduct City business, do not amount to evidence of an official or required policy. Morever, there is no evidence that either defendant Everett or the defendant Mayor imparted information concerning this preference to defendant Mancuso, who made the recommendation concerning LGT, until after LGT began doing business at the airport. Finally, plaintiffs' claim that the City had a policy of not doing business with those who owed it money is belied by the record which indicates that the City renewed or continued its contractual agreement with plaintiffs for an entire year even while plaintiffs were several months in arrears on airport concession payments.

Plaintiffs argue that defendants conspired to unlawfully deprive him of his contract with the City as evidenced by the lies of defendants Everett and Mancuso. Specifically, plaintiffs contend that defendant Mancuso lied when he testified that he alone made the decision to recommend awarding the luggage delivery contract to LGT because the record suggests defendant

14

Everett knew about the agreement and made inquiries regarding its status in May 2003.  Plaintiffs

also assert that defendant Everett lied when he testified that he could not recall if he learned that

Mr. Tawil controlled LGT prior to termination of plaintiffs' contract in July 2003.  In support of

this claim, plaintiffs point to an e-mail which defendant Everett sent to Ms. Smith on May 7, 2003,

which stated in regard to the "baggage delivery agreement:" "I have requested that the

Commissioner call to request.  Please check with him regarding the status."  In response, plaintiff

points out that Ms. Smith sent to Everett the agreement "for his review and authorization."

Plaintiffs also point out that Ms. Smith told defendant Everett in her e-mail that "LGT did not

provide us with all copies of NYS vehicle registrations, authority to transport property certificates

and insurance documents as we had requested . . . in December 2002."

      Since Mr. Tawil's name appears nowhere in the e-mail or proposed vendor contract,

however, it is not clear how this e-mail from Everett demonstrates he was lying when he said he

did not know Tawil owned LGT.  Plaintiffs further plaintiffs theorize:

> Following those e-mails, defendant Mancuso contacted "Sam" i.e. Mr.
> Tawil, commencing on May 7, to follow-up on the status of the
> necessary paperwork.[2]  Clearly a mandate had come from defendant
> Everett, the boss of defendant Mancuso, to finalize the arrangements
> with LGT.  It is apparent that defendant Everett knew as of May 2003
> that LGT was going to obtain the contract, and more importantly, that
> [sic] City's rules regulations had been completely ignored.  When
> defendant Everett testified in February 2004, it was not even one year
> since his emails [sic].  It is obvious that defendant Everett was
> intimately involved in the award of the contract to LGT.

These statements are nothing short of pure conjecture and speculation on the part of plaintiffs.

---

[2]

In support of the claim that defendant Mancuso contacted Tawil, plaintiffs attach a
memorandum obtained during discovery which appears to document his four telephone calls
to Tawil regarding the status of the required paperwork between May 7 and June 30, 2003.

Again, there is no evidence that defendant Everett knew that Tawil, as opposed to LGT, was slated to obtain the baggage delivery contract.  Nor does the evidence relied on by plaintiffs demonstrate that defendant Everett was "intimately involved" in awarding the contract to LGT.  Defendant Everett's e-mail simply advised Ms. Smith that he had told defendant Mancuso to call and request the proposed contract and asked Ms. Smith to "check" with defendant Mancuso regarding the status of said contract.  Thus, there is nothing in the record presented by plaintiffs which demonstrates that defendant Mancuso was lying when he stated that he alone made the decision to recommend LGT to the Mayor for the baggage delivery contract.  Further, the memorandum prepared by defendant Mancuso regarding his telephone calls to Tawil is hardly evidence that anyone, particularly defendant Everett, issued a "mandate" to defendant Mancuso.

As an additional matter, it is not even clear that even if these wholly speculative statements by plaintiffs are true, that they support the allegations in the complaint.  For example, the Court cannot discern the significance of a lie by defendant Everett, if one occurred, concerning his involvement in awarding the contract to LGT.  Plaintiffs' suggestion that defendant Everett was determined to oust them is belied by the fact that they conducted business for years under defendant Everett, apparently without incident.  For the same reason, it is unclear how a lie by defendant Mancuso, assuming he told one, concerning Everett's involvement in the LGT contract, is relevant to the case since there is no evidence that there was ever any problem or bad blood between plaintiffs and defendant Everett.

Indeed, plaintiff Quigley's claim that he was cast aside by the defendant Mayor's administration solely because of his status as a Republican is belied by the fact that he did business at the airport with Everett, an apparent Democrat and key member of the Mayor's administration, for years prior to losing the contract to LGT.  Moreover, plaintiffs point to no statement or act on

the part of any defendant suggesting or demonstrating that plaintiff Quigley's political affiliation was a factor in the decision to award the airport baggage contract to LGT. The only evidence of a political motive presented by plaintiffs is the bald fact that a political supporter and fundraiser for the Mayor requested and received the contract.        The remainder of plaintiffs' proof on this issue requires assumption upon speculation on the part of the Court. For example, plaintiffs rely on an alleged statement made to plaintiff Quigley by Charles Vinal wherein Vinal told Quigley that "they [defendants] could do whatever they wanted." The Court notes in the first instance that there is nothing in this statement that even remotely suggests that plaintiff Quigley's status as an alleged Republican was the reason defendants could allegedly do "whatever they wanted." Secondly, plaintiff acknowledged that at the time he asserts Vinal made this statement, he was not a City employee, nor was he speaking on behalf of defendants. Rather, plaintiff Quigley admitted that he regarded Vinal's statement to representative of his personal opinion.

Plaintiffs also contend that the fact that defendants attempted to award the airport parking concession to Arthur "Skip" Henning, another political supporter and fundraiser for the Mayor, but were allegedly thwarted in their efforts by bad publicity about the proposed deal in the local press, is proof of defendants' conspiracy under § 1983. In support of this claim, plaintiffs present an invitation to an August 2003 "pool party" at the home of Henning and his wife sent to undisclosed persons by Mayor Driscoll, and a  newspaper article dated February 6, 2004, which detailed the alleged controversy surrounding the proposed deal between the City and Henning's company. The article also mentioned that the Mayor did not award the parking contract to Henning, but ordered it rebid in September 2003, a time when his administration was "under fire" for replacing plaintiffs with Tawil. The Court first notes that the newspaper article in question does not constitute evidence of anything insofar as plaintiffs' burden to create a material question of fact. And even if

this were not so, the events outlined in the article relate to a different contract between different parties and occurred after defendants awarded the contract at issue in the present case to LGT.

Finally, the Court addresses plaintiff Quigley's contention that defendants' actions in connection with the airport baggage contact were retaliation for his having made critical statements about the manner in which the airport was being managed and operated. The problem plaintiff Quigley has with this claim is that by his own admission, he did not make any statements constituting "dissenting political speech" until **after** defendants declined to renew his contract.[3] There is no evidence in the record which demonstrates plaintiff Quigley ever criticized defendants publicly or made any comments regarding alleged mismanagement of the airport prior to the contract being awarded to LGT. And even though plaintiff Quigley testified that he made negative comments about defendants after August 11, 2003, he does not provide the time, dates or details regarding any such alleged "dissenting political speech" in the record.

Not only have plaintiffs failed to make a showing that political patronage or the exercise of free speech was a motivating factor in the non-renewal of their contract, they have not shown that politics or free speech was a factor of **any** kind in the City's decision. Standing in sharp contrast to the present bare record is *O'Hare*, 518 U.S. at 715, wherein the plaintiff had performed towing

---

[3]

The Court relies on plaintiff's answers to interrogatories and his deposition transcript wherein he testified as follows:
Q. What statements did you make that you consider dissenting political speech and when did you make them?
A. I'm not sure exactly, but I made them, but they were made after this came down. It was after August 11th.
Q. Okay, they were made, that statements that you refer to in your Notice of Claim regarding the silencing of the dissenting political speech refer to statements made by you after you were notified that your business was terminated out at the Airport; is that correct?
A. That is correct.

service for the City of North Lake for nearly twenty-five years on the mutual understanding that the City would maintain O'Hare's place on the towing rotation list so long as O'Hare provided good service.  Plaintiff continued doing business with the City even after a new mayor, Reid Paxson, was elected in 1988.  Indeed, Paxson told plaintiff he was "pleased" with his work and would continue to employ his services.  When Paxson ran for reelection in 1992, his campaign committee asked plaintiff for a contribution, which plaintiff refused to make.  Instead, plaintiff supported the campaign of Paxson's opponent and displayed the opponent's campaign posters at his place of business.  Soon after, plaintiff was removed from the City's towing rotation list.  In the absence of any alternative explanation for the defendant City's termination of its relationship with plaintiff, the court "assumed" the removal was in retaliation for plaintiff's support of Paxson's opponent.

In the present case, the contract between plaintiffs and the City was for a one year term and was terminable for any reason upon thirty days notice.  Upon expiration of the contract in August 2002, the parties extended it for a year on a month- to-month basis.  There was no "mutual understanding" that the arrangements would continue if plaintiffs provided good service.  Indeed, plaintiff acknowledged as much when he testified that after August 31, 2002, he had asked defendants "two or three times" to "sit down and negotiate a [new] contract."  Moreover, there is no evidence in the record that plaintiff Quigley campaigned or even voted against the defendant Mayor.  Further, there is no proof that any member of the Mayor's administration harbored ill will against plaintiff Quigley or had any reason to exact political retribution against him.  Finally, defendant Mancuso noted in a letter to plaintiffs and in his deposition testimony that he elected not to renew plaintiffs' contract because he did not feel that more than one airport baggage vendor was needed at the airport and plaintiff had been significantly in arrears on concession payments to the City during the course of his previous contract.

19

The Court also contrasts the present record with *Umbehr*, 518 U.S. at 671, wherein the plaintiff trash hauler had transported waste for the defendant County for six years on an "exclusive and uninterrupted basis." *Id.* By its terms, the contract between the plaintiff Umbehr and the County was automatically renewed annually unless either party terminated it by giving notice at least 60 days before the end of the year or a renegotiation was instituted on 90 days' notice. During the term of his contract, plaintiff Umbehr was "an outspoken critic" of the County Board, the three-member governing body of the County:

> Umbehr spoke at the Board's meetings, and wrote critical letters and editorials in local newspapers regarding the County's landfill user rates, the cost of obtaining official documents from the County, alleged violations by the Board of the Kansas Open Meetings Act, the County's alleged mismanagement of taxpayers' money, and other topics." His allegations of violation of the Kansas Open Meetings Act were vindicated in a consent decree signed by the Board's members. Umbehr also ran unsuccessfully for election to the Board. The Board's members allegedly took Umbehr's criticism badly, threatening the official county newspaper with censorship for publishing his writings. In 1990, they voted, 2 to 1, to terminate (or prevent the automatic renewal of) Umbehr's contract with the County.

*Id.*

In this case, plaintiffs' contract was not exclusive. The City had issued licenses to other contractors to transport airport baggage, but it appears that plaintiffs absorbed his competitors' business over time. Further, as referenced above, plaintiffs' contract was not subject to automatic renewal. Most notably, however, is that unlike the plaintiff in *Umbehr*, plaintiff Quigley freely admits he was not a critic of defendants or the City's management of the airport until after they failed to renew his contract. Based on this evidence, there are no facts upon which the Court can connect plaintiff Quigley's political affiliation or "dissenting political speech" with defendants' determination not to renew his contract.

20

As to plaintiffs' contention that the Court simply "infer" defendants were motivated unlawfully in the absence of specific facts in the record, the Second Circuit's decision in *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) is instructive:

> [Courts] must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." 1 Leonard B. Sand, et al., MODERN FEDERAL JURY INSTRUCTIONS ¶ 6.01, instr. 6-1 (1997). Thus, the question is whether the evidence can reasonably and logically give rise to an inference of [unlawful motive or actions on the part of the defendants] under all of the circumstances.

Importantly, the fact that a defendant's state of mind is in issue does not alter the result where only speculative allegations are offered to demonstrate the existence of state of mind after ample opportunity to engage in relevant discovery. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983).

Because plaintiffs' have failed to present any evidence that that defendants impinged any constitutionally protected property or liberty interest of plaintiffs in failing to renew their airport baggage contract, their First and Fourteenth Amendment violation claims under 42 U.S.C. § 1983 are not sustainable.

2.      Denial of Equal Protection

Though not specifically pled in their complaint, plaintiffs assert in their opposition papers that defendants also denied them equal protection under the Constitution - also actionable under 42 U.S.C. § 1983. There is no language in the complaint which alleges a constitutional violation by defendants based on denial of equal protection of the laws. Indeed, the language of the complaint addresses only defendants' alleged deprivation of plaintiffs' liberty and property interests. In the absence of a motion by plaintiffs to amend the complaint to include an equal protection claim, the

Court need not address it on the merits.

Nevertheless, even if the Court considered plaintiffs' equal protection claim as duly pled, it is still deficient.  Plaintiffs assert that the defendants' award of the baggage contract to LGT was "irrational and wholly arbitrary, and constituted intentional disparate treatment."  In support of this claim, plaintiffs allege that they were treated differently than Samir Tawil because they were not political supporters of and contributors to the defendant Mayor.  The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); *Barrett v. Indiana*, 229 U.S. 26, 29-30 (1913) ("equal protection of the laws requires laws of like application to all similarly situated").  Traditionally, for an Equal Protection claim, "a § 1983 plaintiff must [show in contesting summary judgment] that a state actor intentionally discriminated against the plaintiff because of membership in a protected class*." Washington v. Davis*, 229 U.S. 247-48 (1976).  Here, plaintiffs have not identified themselves as members of a particular protected class.  The Supreme Court has explained, however, that the Equal Protection Clause does give rise to a claim on behalf of a "class of one" who has not alleged membership in a class: "Our cases have recognized successful equal protection claims brought by a 'class of one', where the plaintiff [shows] that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "In so doing, we have explained that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Id.* (citations omitted).

22

In order to succeed on a "class of one" claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high.  *See Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005).  Indeed, "the standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are ' *prima facie* identical.'" *Id.* (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)).  The Second Circuit has deemed that test to require a plaintiff in such a "class of one" case to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.  *Id.* (citing *Olech,* 528 U.S. at 565) (singling out must be "intentional[ ].")

Plaintiffs' summary judgment evidence fails to demonstrate an Equal Protection violation.  Although they assert they were treated differently than LGT because of plaintiff Quigley's political affiliation and his exercise of free speech, he has presented no evidence in support of these claims as referenced above.  As noted previously, plaintiffs have not  established the political affiliation of any party or witness in this case.  Instead, they ask the Court to make assumptions about the parties' political motives based on: 1) information in a newspaper article; 2) an invitation sent by the defendant Mayor inviting undisclosed persons to an August 2003 party at the home of Arthur Henning with "special guest" Terry McAuliffe, then Chairman of the Democratic National Committee; 3) allegations in the unverified complaint; 4) arguments of their attorney; and 5) conclusory statements in plaintiff Quigley's deposition testimony as proof of the political party registration of persons involved in the present litigation, including plaintiff Quigley, who nowhere in the record avers that he is a Republican.  What plaintiffs have presented to the Court is a series

23

of unsubstantiated, speculative assertions regarding the unlawful political motives of the defendant Mayor and his "Democratic regime."  Plaintiffs have offered no evidence that defendants targeted them arbitrarily out of spite or in bad faith.  The mere fact that plaintiffs were "treated differently" than LGT, as they allege, "does not, in itself, show malice." *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995).

As a further matter, the evidence presented by plaintiffs simply does not meet the relevant test for similarity.  There is insufficient evidence in the record by which the Court could find that in terms of their relative size, financial health and capability, TJQ, Enterprises, Inc. and LGT are "*prima facie* identical."  In fact, plaintiffs take pains to point out stark differences between TJQ and LGT - that is, unlike TJQ, LGT had no experience running a baggage delivery service nor did LGT have TJQ's contracts or business relationships with the various airlines at the airport. Further, while it appears from evidence in the record that TJQ was one of at least three baggage handlers working at the airport at the time he entered into the August 2001 concession contract with the City, plaintiffs allege that LGT was offered an "exclusive" contract.  Indeed, defendant Mancuso testified that at the time he made the decision to recommend LGT to the Mayor, he had decided that in lieu of contracting with multiple vendors, business conditions at the airport suggested the City only needed the services of one baggage delivery service.

Additionally, while plaintiffs tout their years of experience and established relationships with airlines as factors that should have tipped the scales toward renewal of their contract, it is equally plausible that rational people could conclude that after doing business with plaintiff Quigley, the City reasonably decided to go in a different direction.  By his own admission, plaintiff Quigley  was in arrears for several months of concession payments during the course of his contract with the City.  Moreover, when he finally made the overdue payments to the City in

December 2002, Quigley attached a note stating "As you know, I have survived a back operation, a broken leg and two airline bankruptcies in the last twenty-three months. Therefore, I believe that business can only get better." A reasonable person could conclude from this revelation that plaintiff Quigley had experienced both personal and financial difficulties in operating his business which may have affected efficiency of service and revenues for the City and the various airlines with whom plaintiffs contracted.

To be sure, some rational people might deem it advisable for the City to have continued its contractual agreement with plaintiffs as TJQ was clearly experienced in operating a baggage delivery service. However, other rational people might conclude that the City made an equally sensible decision to streamline concession agreements and contract with a single new vendor whose owner, although inexperienced, was not plagued with plaintiff Quigley's apparent financial or personal woes. Absent from the record in any event is evidence suggesting that prior experience in running a baggage delivery service should be of paramount importance to a municipality contracting with vendors or that LGT's lack of prior experience in the field of baggage delivery has hindered operations at the airport. As referenced above, there is nothing in the record which describes plaintiffs' experience, if any, prior to obtaining a licence from the City to conduct airport baggage delivery. Because the Court concludes as a matter of law that a rational person could find that the City had legitimate, non-discriminatory reasons other than plaintiff Quigley's political affiliation for awarding the airport baggage delivery contract to LGT, plaintiffs' Equal Protection claim necessarily fails.

B.    Plaintiffs' Claims Under 42 U.S.C. § 1985(3)

In support of their section 1985(3) claim, plaintiffs have not raised any arguments other than those set forth in support of their section 1983 claims. In light of the Court's conclusion that

25

plaintiffs failed to set forth sufficient facts demonstrating deprivation of rights or a conspiracy under § 1983, it need not address any further issues as to plaintiffs' claims under § 1985.  Even if this were not true, however, in order to prove a private conspiracy in violation of the first clause of 42 U.S.C. § 1985(3), a plaintiff must show, *inter alia*, (1) that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)), and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment." *Id.* (citing *Carpenters v. Scott*, 463 U.S. 825, 833 (1983).  While plaintiffs' summary judgment evidence is deficient in many respects, such as demonstrating the existence of an agreement between the alleged conspirators, their § 1985 claim can most readily be disposed of for lack of evidence of a class-based discriminatory animus on the part of defendants.  While some courts have held that section 1985(3) classes can be defined by beliefs-specifically, "political" beliefs, *see, e.g., Conklin v. Lovely*, 834 F.2d 543, 549 (6th Cir. 1987); *Keating v. Carey*, 706 F.2d 377, 388 (2d Cir. 1983), plaintiffs have adduced no evidence that any alleged discrimination against them was because of either plaintiff Quigley's political associations or political beliefs.

C.      <u>State Law Claims</u>

        In the complaint, plaintiffs allege that the Court has supplemental jurisdiction over their pendent state law claims pursuant to 28 U.S.C. § 1367.   The Court, however, has dismissed plaintiff's federal claims and because plaintiff asserts no other basis for the Court's jurisdiction, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.  *See* 28 U.S.C. § 1367(c)(3).  Accordingly, Counts IV, V, and VI are dismissed without prejudice.

**IV.    CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment dismissing plaintiffs' federal claims is GRANTED and causes of action one through five of the complaint are hereby dismissed.  Having dismissed plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over pendent state law claims in the complaint in accordance with 28 U.S.C. § 1367(c)(3).  Consequently, the sixth and seventh causes of action in plaintiffs' complaint are dismissed without prejudice.

IT IS SO ORDERED.

DATE:  September 29, 2006

_____
Norman A. Mordue
Chief United States District Court Judge

27